# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 42205

STATE OF IDAHO,

    Plaintiff-Respondent,

v.

KRISTI L. HURLES,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

Boise, April 2015 Term

2015 Opinion No. 45

Filed: May 21, 2015

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County.  Hon. Darla S. Williamson, District Judge.

The district court's restitution order is <u>affirmed in part, reversed in part, and vacated in part</u>. The case is <u>remanded</u> for further proceedings.

Sara B. Thomas, State Appellate Public Defender, Boise, for appellant. Shawn F. Wilkerson argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Jessica M. Lorello argued.

_____

J. JONES, Justice

Kristi Hurles pleaded guilty to grand theft for embezzling from her employer, was sentenced to fourteen years with two years fixed, and was ordered to pay $204,174.61 in restitution. Hurles appealed, challenging the restitution order in a number of respects. The Court of Appeals initially considered the appeal, reversing the restitution order in part, affirming in part, and remanding the case to the district court. The State sought review, which this Court granted.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Hurles worked at the Crescent "No Lawyers" Bar and Grill (Crescent), owned by Jody and Butch Morrison, for 20 years. In recent years, Hurles was primarily responsible for

1

maintaining Crescent's financial books, but she also spent time waiting tables and tending the bar. One of her duties as bartender was to sell and pay out on Idaho State Lottery pull-tabs. When the Morrisons noticed they were losing money on the lottery pull-tabs, they investigated and learned that Hurles' payouts on the game were over 12% higher than the maximum possible payout for the game. A lottery investigator concluded that Hurles had inflated the amount of the payouts by approximately $10,000 over the course of a year and pocketed that amount.

After learning of Hurles' theft with the lottery pull-tabs, the Morrisons began to suspect her of also being responsible for losses they were experiencing with their ATM since Hurles was responsible for maintaining a consistent balance in the machine. The Morrisons' accountant, James Warr, determined there had been a loss with respect to the operation of the ATM for each year 2004 through 2009. Hurles admitted to police that she would cash company checks to get money to stock the ATM but would then deposit only a portion of that cash into the machine, pocketing the remainder. She gave the example that if there was a $500 ATM check on a particular day, she would cash the check, put $400 into the ATM, and keep the other $100. Hurles admits she stole from Crescent in this manner for a year and a half, for a total of between $20,000 and $50,000. Based on the losses from the ATM for several years, Morrisons believed Hurles was stealing in this manner since 2004[1] until she was fired in 2010.

Based on the lottery investigation and Hurles' admission to stealing ATM funds, the State charged Hurles with two counts of grand theft. Count I alleged that between December 30, 2008, and December 31, 2009, she wrongfully took in excess of $1,000 "from the pull tab profits from the owner," while Count II alleged that between the same dates she wrongfully took in excess of $1,000 "from the ATM profits" of Crescent. Pursuant to a plea agreement, Hurles entered a guilty plea to Count II, while the State agreed to dismiss Count I. At the plea hearing, the State orally stated the plea agreement on the record, including a term referring to restitution though not specifying an amount.

The amount of restitution became highly contested, and the matter was set for a restitution hearing.[2] A state lottery official testified that Hurles was responsible for stealing $10,000 through the lottery pull-tab payouts. That amount was part of the ultimate restitution award, and Hurles does not challenge that portion on appeal. The State also called a paralegal

---

[1] The State did not seek restitution for thefts in 2004, as they were beyond the statute of limitation.
[2] This restitution hearing actually turned into three hearings where restitution was addressed.

from the Givens Pursley law firm, which the Morrisons had hired to represent Crescent in civil litigation that arose in response to Hurles' thefts. The paralegal was responsible for organizing the information from all the checks the Morrisons had written since 2005 for the purpose of internal accounting procedures, including stocking the ATM. The paralegal created a spreadsheet to document the different elements of these checks: check number, date, payee, whether they were stamped "for deposit only," who endorsed them, and any notes about the checks. This spreadsheet was simply a compilation of information taken from the checks themselves and does not reflect any information concerning what was done with the money after the checks were cashed, whether for example Hurles deposited the full amount of a particular check into the ATM, or only a portion, or kept it all. The State relied on this spreadsheet to reach the amount of restitution it ultimately requested in relation to Hurles' ATM thefts, $145,440. The district court advised the State that it wanted to know the amount the Morrisons had to spend in attorney fees that were related to Hurles' thefts because that amount should be included in the restitution order as well.

To rebut the amount of restitution claimed by the State, Hurles called the Morrisons' accountant to testify. However, the Morrisons asserted their accountant-client privilege when Warr was asked to describe the nature of the problem with the ATM balance at Crescent. Hurles argued the Morrisons had waived their privilege by (1) filing a lawsuit against Warr, (2) allowing Warr to talk to police and disclose certain documents in the presentence investigation (PSI) that tended to show amounts of the Morrisons' loss, and (3) testifying at the restitution hearing about Warr's work. The court seemed intrigued by Hurles' argument regarding Jody Morrison's testimony as to Warr's accounting work for Crescent. However, Hurles' attorney had only his personal notes from the previous hearing where she had testified, and the attorney admitted he had not reviewed the transcript and did not know specifically what had been asked or answered. Absent other evidence, the court decided to sentence Hurles based on the proof that had been offered up to that point. It did, however, tell Hurles' attorney that he would have thirty days to move for reconsideration to try to prove the accountant-client privilege had been waived or make an Idaho Criminal Rule 35 motion for reduction in sentence.

The district court ultimately ordered $204,174.61 in restitution, which consisted of (1) $10,000 from the lottery pull-tab thefts, (2) $145,440 from the ATM thefts, and (3) $48,734.61

3

for Morrisons' attorney fees.[3] Hurles appealed the judgment of conviction, though her arguments are all related to the amount of restitution. On appeal, Hurles argues that the Morrisons implicitly waived their accountant-client privilege, that the restitution award was not based on substantial and competent evidence, and that the Morrisons' civil attorney fees were not an appropriate part of restitution. The case was originally assigned to the Court of Appeals, which affirmed in part, reversed in part, and remanded the case for further proceedings. This Court granted the State's petition for review.

## II.
## ISSUES ON APPEAL

1. Whether the district court's restitution calculation was supported by substantial and competent evidence.

2. Whether the district court erred when it concluded that the Morrisons did not implicitly waive the accountant-client privilege.

3. Whether the district court abused its discretion when it included the Morrisons' attorney fees as part of the restitution award.

## III.
## ANALYSIS

### A.   Standard of review.

"In cases that come before this Court on a petition for review of a Court of Appeals decision, this Court gives serious consideration to the views of the Court of Appeals, but directly reviews the decision of the lower court." *State v. Schall*, 157 Idaho 488, 491, 337 P.3d 647, 650 (2014). "The decision regarding whether to order restitution, and in what amount, is within the district court's discretion," guided by factors in Idaho Code section 19-5304(7). *State v. Corbus*, 150 Idaho 599, 602, 249 P.3d 398, 401 (2011). "The determination of the amount of restitution is a question of fact for the trial court whose findings will not be disturbed if supported by substantial evidence." *State v. Lombard*, 149 Idaho 819, 822, 242 P.3d 189, 192 (Ct. App. 2010).

### B.   Whether the district court's restitution calculation was supported by substantial and competent evidence.

Absent a determination that restitution is inappropriate under the circumstances, where a defendant's criminal conduct results in an economic loss to a victim, the trial court must order the defendant to pay restitution "for any economic loss which the victim actually suffers." I.C. § 19-5304(2). In addition to the loss directly caused by the crimes of which a defendant is

---

[3] Hurles was also sentenced to two years fixed and twelve years indeterminate. She does not challenge this part of her sentence on appeal.

convicted, a defendant may consent to pay restitution for loss caused by "crimes which are not adjudicated or are not before the court." I.C. § 19-5304(9); *State v. Nienburg*, 153 Idaho 491, 495–96, 283 P.3d 808, 812–13 (Ct. App. 2012).

Because Hurles only pleaded guilty to Count II, which alleged that she stole in excess of $1,000 from the ATM profits between December 2008 and December 2009, the question becomes whether she consented to pay restitution for thefts outside the scope of the language used in Count II.[4] The State argues the language of the plea agreement and Hurles' conduct over the course of the plea hearing and restitution hearings show she agreed to be responsible for whatever amount of restitution the State could prove within the agreed-upon parameters. Hurles responds that the language in the plea agreement concerning restitution was simply a statement as to what the State intended to seek. She additionally argues that even if there was an agreement regarding restitution, its terms were too ambiguous to be enforced.

It is not unusual for a defendant to commit in a plea agreement to be responsible for restitution not directly caused by the crime of which the defendant is convicted. *See, e.g.*, *State v. Shafer*, 144 Idaho 370, 373–75, 161 P.3d 689, 692–94 (Ct. App. 2007). When a plea agreement has been reached by the parties, the court must require the parties to disclose that agreement in open court at the time the plea is offered. I.C.R. 11(f)(2). This disclosure is necessary for the trial judge to properly administer the plea agreement. *Nienburg*, 153 Idaho at 496, 283 P.3d at 813. "[A]n appellate court can know only what is revealed on the record and it is therefore incumbent upon the respective attorneys to clearly and unambiguously state the entire plea agreement on the record." *State v. Kellis*, 129 Idaho 730, 733, 932 P.2d 358, 361 (Ct. App. 1997). It is also the trial court's duty to "ensure that the record contains a clear and full disclosure of all essential terms of the agreement reached." *Id.*

Plea agreements are contractual in nature, and we have often used contract law as a method of analyzing those agreements. *Dunlap v. State*, 141 Idaho 50, 63, 106 P.3d 376, 389 (2004). If the terms of the agreement are unambiguous, the meaning and legal effect of the agreement are questions of law. *Id.* But where the meaning of an agreement is ambiguous, the agreement's interpretation is a question of fact, which focuses on the intent of the parties. *Id.*

---

[4] Hurles devoted much of her briefing on this issue to arguing the ATM losses outside the above date range are not causally connected to the crime to which she pleaded guilty. The State does not contest Hurles' position on this argument, instead arguing only that there was consent under I.C. § 19-5304(9), which would be an exception to the causation requirement. Therefore, we do not address Hurles' causation arguments.

Where an agreement has not been reduced to writing, and where the oral statements of that agreement on the record are insufficient to determine the intent of the parties, it may be necessary for the district court to make further factual findings concerning the terms of the agreement. *See Kellis*, 129 Idaho at 734, 932 P.2d at 362.

The plea agreement here was not reduced to writing. The district court asked the prosecutor to put the plea agreement on the record, in response to which the following exchange took place (Mr. Stellmon representing the State and Mr. Crafts representing Hurles):

> Mr. Stellmon: Your Honor, the state's going to recommend a unified sentence of 14 years, 2 years with 12 indeterminate. The state is going to seek restitution on all DRs that were disclosed in discovery. I have a list of those right here, but I think defense counsel understands the ones we're talking about.
>
> Mr. Crafts: I do, Your Honor.
>
> Mr. Stellmon: The defendant is free to recommend a lesser sentence. The state is going to ask for imposition of the 2 years fixed followed by 12 years. And then we're free to discuss all facts that are charged or dismissed and pursuant to these negotiations.
> . . .
> The Court: Mr. Crafts, is that your understanding of the plea agreement?
>
> Mr. Crafts: It is, Your Honor.
>
> The Court: And, Ms. Hurles, is that your understanding of the plea agreement?
>
> The Defendant: Yes, Your Honor.

Thus, it appears that counsel for the State and Hurles had an understanding of the parameters of the restitution agreement. The State would ask for restitution based on all of the DRs disclosed in discovery, as per a list apparently in the State's possession. Hurles' attorney appears to have been aware of the list and understood which DRs were relevant. Unfortunately, none of those present thought it necessary either to explain how much in the way of restitution the DRs called for, or to place the "list" of DRs in evidence to properly document the agreement.[5]

Further proceedings did help to flesh out one aspect of the agreement—the dates for which Hurles could be held responsible for restitution under Count II. At the first restitution hearing, an exchange took place specifically discussing the period of time at issue for such

---

[5] As the State points out in its brief, "DR" likely refers to the reports prepared by the Boise Police Department, i.e., Department Reports. There are two such reports attached to the PSI—an initial report and a supplemental report. Also attached to the PSI is a copy of the spreadsheet prepared by the Givens Pursley paralegal. The amount of ATM thefts reflected on the supplemental DR is different than that reflected on the spreadsheet and there is no indication as to how or whether the two tallies are related.

restitution. Jody Morrison testified she had accounting records showing the ATM account shortages. Hurles' attorney asked if the records she was speaking of covered the time period of 2005 to 2010. When Jody replied that the losses went back to 2004, Hurles' attorney addressed with the court and the State the years that were at issue, arguing that 2004 was beyond the statute of limitations. Hurles' attorney stated, "2004 is not in the equation," but made no such statement with respect to any other year from 2005 through 2010. Once he confirmed that the spreadsheet prepared by Givens Pursley covered only 2005 through 2010, excluding 2004, Hurles' attorney ended the discussion and went back to his cross-examination of the witness. He made no objection to the State's use of the spreadsheet based on the fact that it covered time periods outside those mentioned in the charging documents, even though he knew the amount the State was seeking was the amount on the spreadsheet reflecting thefts from 2005 through 2010. Later in the same cross-examination, Jody made reference to Hurles having stolen from Crescent for five years, and Hurles' attorney did not question this fact. Hurles' failure to challenge the time period for which the State was seeking restitution indicates she was in agreement with the State regarding the period at issue.

At the final restitution hearing, the district court restated its understanding of the parties' restitution agreement that was placed on the record at the plea hearing. The court stated:

> Ms. Hurles, you previously appeared in court, and you pled guilty to grand theft, Count II; and Count I was dismissed. . . . You are to pay restitution on all incidences, not simply the one grand theft charge, but the entire time that you were there working for the employer and any thefts that may have occurred. So restitution was to cover all of that. . . . Is that your understanding of the prior proceedings, Ms. Hurles?

Hurles answered, "Yes, ma'am." This exchange further supports the 2005 through 2010 timeframe.

The parties appeared to have understood what had been agreed to with regard to restitution by the end of the restitution hearings. It had been agreed that the DRs would be the basis for determining restitution and that this would include ATM funds embezzled from 2005 through 2010. But, rather than basing the restitution order on the DRs, the district court's restitution order for ATM thefts was primarily based on the spreadsheet prepared by the Givens Pursley paralegal. Nothing in the record indicates how or whether the spreadsheet relates to the DRs. The parties did not agree that the restitution would be based upon a spreadsheet but, rather, upon DRs known to counsel for both parties.

7

There is no indication in the record that the parties agreed to modify the restitution agreement by substituting some metric other than the DRs for determining the amount of restitution for ATM thefts. The specific agreement was that the DRs would be utilized as such metric and the record does not indicate that this metric was used.

Because the proof presented to support the restitution order did not conform with the agreement made by the parties for the embezzlement of ATM funds, we vacate that portion of the restitution order in the amount of $145,440. The case is remanded for further proceedings with respect to that issue. On remand, the parties can identify the DRs that counsel appear to have agreed upon at the plea hearing and quantify the amount of restitution called for pursuant to those DRs. The remand will also allow the court to address other concerns raised by Hurles regarding the ATM losses. Hurles devoted much of her briefing to this issue, claiming that the district court awarded Crescent the full amount of the checks Hurles cashed, even though the Morrisons admitted that part of each check was returned to Crescent.

The district court correctly ordered restitution in the amount of $10,000 for the lottery pull-tab thefts. Those thefts were not included in Count II but Hurles does not contend on appeal that she did not agree to pay restitution for the same. On her guilty plea advisory form she responded, "Yes, in an amount to be determined to Crescent Bar," to the question, "Have you agreed to pay restitution in another case as a condition of your plea agreement in this case?" Hurles does not challenge the $10,000 ordered by the district court for the lottery pull-tab thefts but, rather, acknowledges that her answer on the guilty plea advisory form pertained to the lottery pull-tab thefts. Therefore, we affirm the district court's order with respect to the $10,000 in restitution for lottery pull-tab thefts.

## C.     The accountant-client privilege issue can be addressed on remand.

Hurles also argues on appeal that the district court erred in disallowing Warr's testimony based on the accountant-client privilege. The district court will have the opportunity to address the privilege issue if it arises again in the proceedings on remand. Because we remand for further proceedings, and because evidentiary rulings are matters typically within the purview of the district court, we do not rule on the issue of whether the Morrisons waived their accountant-client privilege.[6]

---

[6] If the accountant-client privilege does come up again during proceedings on remand, the parties should be mindful that waiver is not an all-or-nothing matter. In other words, waiver can be shown to be complete or partial, affecting some but not all matters between the accountant and the client.

**D.      Restitution for attorney fees incurred by the Morrisons.**

At the conclusion of the first restitution hearing the court stated that the restitution amount should include all the money the Morrisons spent "on attorneys and accountants and other people to figure out what's been stolen." At the second restitution hearing, the State represented the Morrisons' attorney fees as $48,734.61, though it did not explain the details of how that amount was tallied. The PSI contained a list of Crescent's attorney fees with brief descriptions of what those fees were for, including (1) filing and pursuing third-party lawsuits, (2) intervening in Hurles' bankruptcy action, and (3) preparing for the restitution hearings. The court ordered restitution that included this full amount.

Idaho Code section 19-5304(2) allows restitution to be ordered "for any economic loss which the victim actually suffers."

> "Economic loss" includes, but is not limited to, the value of property taken, destroyed, broken, or otherwise harmed, lost wages, and direct out-of-pocket losses or expenses, such as medical expenses resulting from the criminal conduct, but does not include less tangible damage such as pain and suffering, wrongful death or emotional distress.

I.C. § 19-5304(1)(a). Attorney fees are direct economic losses, recoverable as part of a restitution order, if they were "incurred in order to address the consequences of the criminal conduct" and were "necessary in order for the victim to recover the losses" caused by the defendant's criminal conduct. *State v. Parker*, 143 Idaho 165, 167–68, 139 P.3d 767, 769–70 (Ct. App. 2006). An expense incurred to prevent future harm is not compensable through restitution. *See id.* at 167, 139 P.3d at 769. However, expenses incurred in investigating the extent of the past losses from the criminal activity and in preparing for a restitution hearing are allowed. *See id.*

**1.   Attorney fees in third-party lawsuits.**

On appeal, Hurles argues that attorney fees incurred in the Morrisons' civil lawsuits against Warr, Warr's accounting firm, and U.S. Bank are not an appropriate part of a criminal restitution order because they were not direct economic losses caused by Hurles' thefts. The State responds that the fees in the third-party lawsuits are an appropriate part of the restitution order because they were the actual and proximate result of Hurles' thefts under *State v. Corbus*, 150 Idaho 599, 249 P.3d 398 (2011).

Although this Court in *Corbus* did explain a two-part test to decide whether a claimed loss results from a defendant's criminal conduct, we did not hold this causation test was the sole requirement for a loss to be ordered as restitution. The *Parker* test to determine whether a loss is

a "direct economic loss" is a threshold test that must be met in order for a loss to be required as restitution. In *Corbus*, it was not necessary to address this question because the claimed loss was medical expenses, something expressly included in the statutory definition of "economic loss." *See Corbus*, 150 Idaho at 601–02, 249 P.3d at 400–01; I.C. § 19-5304(1)(a). Therefore, in this case the attorney fees for third-party lawsuits are awardable as part of restitution only if they meet the *Parker* test of being a "direct economic loss" *and* the *Corbus* test for causation. It cannot be said that the Morrisons' lawsuits against Warr, Warr's accounting firm, and U.S. Bank are necessary to recover the direct losses from Hurles' thefts, because the restitution award will allow the Morrisons to recover what they lost from those thefts. Because these attorney fees are not recoverable as economic losses under Idaho Code section 19-5304(2), we reverse that portion of the restitution order.

### 2. Attorney fees for the adversary proceeding in bankruptcy.

Crescent incurred attorney fees associated with filing an adversarial complaint in Hurles' bankruptcy. Hurles argues the fees incurred to intervene in the bankruptcy case were not awardable as restitution because they were incurred to prevent a future harm, rather than to compensate for a past harm.

As with the third-party lawsuits, the fees associated with the bankruptcy intervention were not direct economic losses caused by Hurles' thefts. Although the Morrisons may have thought it necessary to intervene in the bankruptcy to protect themselves from the possible discharge of what was owed to them, their actions were taken for the prevention of a future harm that was not certain to take place. Additionally, there were already criminal charges pending against Hurles in which the State was likely to seek restitution for the victims, which is not dischargeable in bankruptcy. Because these fees are not the proper subject of restitution, we reverse that portion of the restitution order.

### 3. Attorney fees for professional assistance in restitution proceedings.

Crescent incurred further attorney fees by having Givens Pursley represent it during the restitution hearings, including fees associated with the preparation of the spreadsheet on which the State relied. Hurles argues the district court abused its discretion in awarding $14,876.73 for this work because it was "unreliable, duplicative, and therefore, unreasonable." Regardless of the merits of the district court's order in this regard, it is clear that restitution can be ordered for work performed to investigate and calculate a victim's losses from embezzlement. As the Court

of Appeals correctly stated in *Parker*, fees incurred investigating the extent of a theft and preparing for a restitution hearing are recoverable as restitution because they are expenses necessary to recover the losses related to the defendant's criminal conduct. 143 Idaho at 167, 139 P.3d at 769. While the Morrisons are entitled to restitution for work performed by Givens Pursley in this regard, the fees for the work must have been related to determining the amount of the theft in accordance with the restitution agreement. As noted above, the restitution agreement called for determining the amount of restitution based upon the DRs. There is no indication in the record as to whether or how the spreadsheet prepared by the Givens Pursley paralegal relates to the DR list or the DRs. That is something that will have to be determined on remand. Therefore, we vacate the remainder of the restitution order pertaining to attorney fees.

### IV.
### CONCLUSION

We affirm the district court's order requiring restitution in the amount of $10,000 for Hurles' theft of lottery pull-tab monies, we reverse the restitution ordered for attorney fees in the amount of $33,857.88 for the third-party lawsuits and bankruptcy adversary proceeding, and we vacate the restitution order for ATM thefts in the amount of $145,440 and the remaining amount of attorney fees incurred by the Morrisons. The case is remanded to the district court for determination of restitution relating to the ATM thefts and the Morrisons' fees incurred in determining and presenting their embezzlement losses.

Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.

11